## THE AFRICAN METHODIST EPISCOPAL CHURCH *v.* THE CITY OF NEW ORLEANS.

The ordinance of the city of New Orleans, approved April the 7th, 1858, relative to the assemblages of colored persons, free or slave, in violation of law, is not unconstitutional in its provisions.

The Act of the Legislature of March 20th, 1850, entitled "An Act to amend the fourth section of an Act providing for the organization of certain corporations in this State, approved April 30th, 1847," is a mere legislative interpretation of the word "persons" in this Act of 1847.

Where a number of free colored persons had associated themselves together as a corporation, for purposes of public worship, and purchased property in their social capacity—*Held :* That although such a corporation has no legal existence, yet the members, considered as individuals, are entitled to their rights of property in what may have been acquired in the corporate name.

APPEAL from the Sixth District Court of New Orleans, *Howell, J.*,
*V. F. & J. B. Cotton*, for plaintiff.   *J. J. Michel*, for defendant and appellant.

BUCHANAN, J.   On the 6th day of October, 1848, ten free men of color organized themselves into a private corporation having a religious object, under the Act of 30th April, 1847, (Session Acts, p. 151,) entitled "An Act providing for the organization of certain corporations in this State."

The instrument of incorporation contains four articles.

By the first, a corporate name (The African Methodist Episcopal Church) was taken, and the power of acquiring and holding real and personal property, under such corporate name, was assumed.

By the second article it was declared, that the purposes and objects of the incorporation were, to establish a place of religious worship, and to administer the affairs of a religious body, according to existing laws.

By the third article, the corporators assumed the power of establishing by-laws and regulations conformably to law and the ordinances of police, and of admitting new members, with perpetual succession.

By the fourth article, it was declared, that all matters purtaining to said corporation, such as the erection of a suitable building for a place of religious worship, the organization of a religious congregation, the election of a preacher, the collection and disbursement of revenues, &c., shall be determined by a majority of the corporators.

This instrument was approved by the District Attorney and by the Governor, and enrolled in the office of the Secretary of State, as required by the Act of 30th April, 1847.

The present suit is instituted, by petition, in the above mentioned corporate name, on the 20th May, 1858. Petitioners allege, that they have purchased, under their instrument of incorporation aforesaid, three churches in the city of New Orleans, which are particularly described. They aver, that since the 7th April, 1858, the city of New Orleans has usurped petitioners' franchise, and taken illegal possession and unauthorized control of the whole of their property, by the passage and promulgation of a city ordinance which prohibits the members of the African Methodist Episcopal Church from assembling for worship, or any other purpose, in the churches aforesaid, under heavy penalties. That the passage and promulgation of said city ordinance have been the means of driving off each and every member of the large congregations which attended the respective churches aforesaid ; and of preventing the members of the African Methodist Episcopal Church from attending divine worship. Petitioners aver that the ordinance in question is null and void, as violative of the vested constitutional rights of petitioners, and specially as contrary to Article 105 of the State Constitution. The petition goes on to arraign, for unconstitutionality, a certain Act of the Legislature of Louisiana, approved March 20th, 1850, (Session Acts, p. 179,) in case said Act be pleaded by defendant in defence to this action. The Articles of the Constitution which, it is charged, this Act of the Legislature violates, are Articles 109 and 119 of the Constitution of 1845, (in force when the Act was passed,) which are identical with Articles 105 and 116 of the present Constitution of the State.

The petition concludes by a prayer that the city of New Orleans be cited ; and that it be decreed that the city ordinance of the 7th April, 1858, and the Act of the Legislature of March 20th, 1850, are illegal, unconstitutional, null and void ; and that the city be condemned to pay petitioners rent for their three churches, for each and every month that the city retains possession, and refuses to allow petitioners to enjoy the free use and occupation of the same.

The answer of the city is a general denial.

Plaintiffs had judgment, and the city appeals.

The ordinance of which the plaintiffs complain does not seem to us to be liable to the charge of unconstitutionality.

It commences by a preamble, stating that assemblages of colored persons, free and slave, have increased of late, in violation of law, and that it is an evil which requires correction.

The ordinance proceeds to declare that no such assemblage, for purposes of worship, shall be suffered by the police, unless such congregation be under the supervision and control of some recognized white congregation or church ; also, that no colored person shall be allowed to address any assembly or deliver any

public discourse, without previous written permission from the Mayor; that any person contravening the ordinance shall be arrested and brought before the Recorder.

In this ordinance, there is no mention made of the plaintiffs, or of any person, society, or corporation. It is general in its terms, and does not seem to overstep the legitimate bounds of the police administration vested in this municipal corporation.

The Act of the Legislature of March 20th, 1850, is entitled "An Act to amend the fourth section of an Act providing for the organization of certain corporations in this State, approved April 30th, 1847." It provides that " in no case shall the provisions of this Act be construed to apply to free persons of color in this State, incorporated for religious purposes or secret associations, *and any corporations that may have been organized by such persons under this Act for religious purposes, or secret associations, are hereby annulled and revoked.*"

This Act is viewed by us as a legislative interpretation of the word " persons " in the Act of 1847. Had the question been submitted to this court, in the absence of this Act of 1850, whether the Legislature intended to sanction, by the Act of 1847, the formation of corporations composed entirely of colored persons, a majority of this court is of the opinion, that we would have been bound to rule the negative. The African race are strangers to our Constitution, and are the subjects of special and exceptional legislation.

The legislative interpretation of 1850, comes in aid of our own views of construction of the Act of 1847.

We are not to be understood as denying the members of this pretended corporation, considered as individuals, the right of property in what they may have acquired in a social name : a right as fully acknowledged by our laws, in the case of colored persons, as of white persons. C. C. 437.

It is, therefore, adjudged and decreed, that the judgment of the District Court be reversed, and that there be judgment for defendant, with costs in both courts.

MERRICK, C. J., concurring. I concur in the decree in this case, but for different reasons from those advanced by my colleagues.

In October, 1848, ten free men of color obtained an act of incorporation in due form under the act of 1847, p. 151.

The first article of the charter gives them the title or name by which they sue in this case and enables them to acquire such real and personal property as is necessary for the objects of the corporation.

The second article declares the purposes and objects of the act to be, to establish " a place of religious worship for the said corporation, to exercise all powers requisite to the administration of the affairs of such religious body according to existing laws."

The third article provides for the passage of by-laws from time to time conformable to law and the ordinances of police, also the mode by which other persons " having the requisite legal qualifications " may be elected corporators.

The fourth and last article declares, " that all matters pertaining to said corporation, such as the erection of a suitable building for a place of public worship, the organization of a religious congregation, the election of a preacher. the collecting and disbursing of revenues, and other or subsequent measures essential to the interests of said corporation shall be established and determined by a majority of the corporators existing at the time of such proceeding."

The corporation have acquired and own three churches in different parts of the city, of the alleged value of $21,000. Witnesses state that their meetings were orderly, and did not disturb people residing in the neighborhood of the same.

In 1850, an Act of the Legislature was passed, amending the Act of 1847, and making a copy of the Act of Incorporation, certified by the Secretary of State, evidence. The Act has the following proviso, viz, "Provided, that in no case shall the provisions of this Act be construed to apply to free persons of color in this State, incorporated for religious purposes, or secret associations; and any corporation that may be organized by such persons, under this Act, for religious purposes or secret associations, are hereby annulled and revoked." Acts 1850, p. 179.

On the 7th of April, 1858, an ordinance was passed by the Common Council of New Orleans, and approved by the Mayor, reciting the dangerous tendency of frequent and numerous assemblages of free persons of color. It ordains that every assemblage of free persons of color for worship " shall be under the supervision and control of some recognized white congregation or church located within the limits of the city, to whose discipline and management said congregation or church of persons of color shall be wholly amenable, both as to its spiritual as well as to its temporal affairs."

The ordinance prohibits any slave, or free person of color, from holding meetings and delivering discourses, unless permission shall have been first obtained from the Mayor by the aforesaid white congregation, under a penalty of one hundred dollars, and such license or permission to be renewed annually. The officers of the police are charged with the arrest of any person acting in contravention of the Act.

The corporators, upon the passage of the ordinance, under the advice of counsel, closed their places of worship. They have brought this suit to prevent the execution of the ordinance, and to cause the same to be declared null, and for damages for depriving them of the benefit of their buildings.

Judgment was pronounced by the lower court, declaring the Act of 1850 and the ordinance null and void as to the said plaintiffs, and condemned the city to pay $110 per month, from the 7th day of April, 1858, in the nature of rent, until plaintiffs obtain possession of their property.

The Act of 1847, p. 151, authorized *any persons* exceeding six, to form, not only religious, but also charitable, literary and scientific corporations, by conforming to the regulations of that Act. The Act is not confined to electors or voters, but extends to *persons* generally. In this sense, it appears to me, it must be held to apply to all persons capable of acquiring and exercising rights. And free people of color have such capacity. They may hold real estate and slaves, and I assume they may hold bank stock and railroad stock under the term " persons." Why, then, may they not hold rights as members of a religious corporation? I know no reason, except they be expressly dissabled by some statute in existence when they attempted to acquire their rights.

At the time the act of incorporation was granted, it did not occur to the District Attorney or Governor, that free people of color were incapacitated from acquiring rights in the class of corporations authorized by the Act of 1847, for they successively approved the same under their respective signatures, and the act was enrolled in the office of the Secretary of State, according to law, by order of *Isaac Johnson*, a learned jurist, who had been a member of the Court of Errors and Appeals.

The Act of 1850 admits the capacity of free people to acquire such rights, for it declares that the Act does not apply to free persons of color in this State for *religious purposes* or *secret associations*, omitting all mention of scientific, literary, or charitable associations, and it undertakes to annull those that have been organized for *religious purposes* or *secret associations* only. The Act, therefore, impliedly admits the capacity of free colored people as persons. It is a negative with an affirmative pregnant, that free persons of color may still form themselves into *scientific, literary* and *charitable* associations, so they be not secret.

The Act of 1855 also, is as general as the Acts of 1847 and 1850, and impliedly authorizes the formations of corporations by free people of color for *scientific, literary,* and *charitable* purposes; for after the grant of the general power to form these and religious corporations, the restriction is in these words. " In no case shall the provisions of this act be construed to apply to free persons of color in this state, incorporated for *religious purposes or secret associations*. Then it *is* to be construed to apply to scientific, literary and charitable associations formed by such persons, if they be not secret associations.

But at the time the act of incorporation was formed, there was no restriction or incapacity on their part as to *religious* corporations.

The question was submitted to the proper authority, to determine whether the object of the association was lawful, and it was so decided by the tribunals appointed for that purpose, the District Attorney and the Governor. Acts 1847, p. 151, sec. 1. If they had erred, we would have no right, as I think, to revise their action in this form of proceeding.

The corporation would exist until annulled in a direct action brought in the name of the State for the purpose of annulling the act of incorporation. See *Atchafalaya Bank* v. *Dawson*, 13 La. 497 ; 5 An. 179.

But I do not think the District Attorney and the Governor erred. A person is a human being, considered as the subject of rights, as distinguished from a thing, whether animate or inanimate. Burill, Law Dic., verbo Person. Free persons of color are regarded as persons under our law. See Civil Code, Arts. 36, 38. They are majors or minors ; they may take and hold property by purchase, inheritance or donation; they may marry (26, 95,) and as a consequence, exercise parental authority over their children ; they may be witnesses, (ibid 2261) ; they may appear in notarial acts, (Acts of Legislature 1855, p. 322, sec. 5) ; they may stand in judgment (C. C. 177), and they are responsible under the general designation of " persons," for crimes. See also 11 An. 724; also, Institutes L. 1, Tit. 3.

So far as it concerns every thing, except political rights, free people of color appear to possess all other rights of persons, whether absolute or relative. And, in this respect, the Civil Code seems to me to be quite clear; for example, on the subject of obligations, Art. 1775 says : " All *persons* have the capability to contract, except those whose *incapacity* is specially declared by law. These are persons of insane mind, *slaves*, those who are interdicted, minors and married women." Here it is manifest that the lawgiver, under the term persons, intended to include people of color, because he has enumerated all other incapacitated persons, not excepting slaves.

It is demonstrated in the great case of *Dartmouth College* v. *Woodward*, 4 Wheaton, 518, that acts creating a private corporation on the part of the sovereign, and the acceptance on the part of the corporators, is a contract between the government and the corporators. See also 14 La. 395, to the same

effect. All, therefore, it seems, which is necessary to enable a person to become a corporator, is capacity to contract, or in other words, to be *sui juris.*

By the Act of 1848, reënacted in 1855, any number of persons not less than six, are authorized to form corporations to work mines, to construct railroads, canals, plank-roads, bridges, &c., to effect insurance, to carry on manufactures of cotton, woollen, linen, silk and hemp cloths, and cordage; to construct and carry on founderies, drydocks or floating docks, to build ships, to supply towns and cities with gas, or water; to compress cotton; for sea navigation by steam, &c., &c. The enumeration of these objects of industry and enterprise shows that the inducement is here held out to all *persons,* to take part in such corporations, who have skill, industry and capital to invest in them. Acts 1848, p. 70; 1855, p. 182; Phillips' Digest, 114.

Again, the same term, " persons," is employed in the Act for the creation of free banks. Phillips' Dig. 32. Was it ever supposed that free people of color could not become owners of bank stock, whether of the free, or the specially incorporated banks? Suppose they contract for it, or it is adjudicated to them at Sheriff or succession sales? Again, in works for internal improvement, such as railroads, where the parish or other municipal corporation has subscribed stock, the free person of color who happens to own lands is forced to become a stockholder. Phillips' Dig., p. 119, secs. 28–31.

It is true free people of color have no right of direct representation in our government; but, as far as I have observed, they are not the less the object of all general laws (not political), whether those laws confer rights and privileges, or impose fines, penalties and forfeitures.

I therefore conclude, that the plaintiffs had capacity to form themselves into a religious corporation in 1848, the date of their charter. By that association, and the purchase of property since, they acquired rights. Did the Act of 1850 affect those rights? I maintain it did not, for these reasons, viz : 1st. The power to declare a corporation forfeited is a judicial power, and cannot be exercised by the Legislature ; and 2d. That the Legislature cannot be considered as intending to dissolve this particular corporation, for reasons of public interest, because they have not so declared in the Act, and had they so said, their act would have been inoperative, because no indemnity is made or offered to the corporators. *Montpelier Academy* v. *George,* 14 La. 406; *Dartmouth College* v. *Woodward,* 4 Wheaton, 518.

On the first of these grounds, it is sufficient to remark, that the power of the Legislature to declare a forfeiture seems to be fully considered in the case of *Perry et al.* v. *The Clinton and Port Hudson Railroad Company,* 11 Rob. 412, and denied. In that case, the Legislature had declared that certain property pledged to the State had become forfeited for non-payment of interest. This was held not to be within the functions of the legislative department.

On the second ground it may be remarked, that it is no sufficient indemnity, (as has been supposed,) in the case of a dissolution of a corporation for public interest to leave the property acquired by the same in the hands of the corporators. If that were an indemnity, the Legislature might dissolve every incorporated bank, every railroad charter, and every insurance company, and there would be no redress. This supposition appears to ignore the fact that the corporation is a judicial person distinct from the members composing it. In the Dartmouth College case, it was taken for granted by the court, that the trustees, who alone complained, " had no beneficial interest to be protected," and that the

donors had parted with their property, and had no interest so long as the corpo-
ration existed; yet, it was demonstrated in that case, that the Legislature of
New Hampshire could not modify the act of incorporation, because it impaired
the obligation of a contract. So in the case of the *Montpelier Academy* v. *George*,
14 La. 395, the Legislature which had made large donations to the academy,
attempted to change the Board of Trustees. The Article 438 C. C. was also
relied on in that case, as evidence of such power; but it was held that the Act,
notwithstanding the Article, contravened the Constitution of the United States
and of this State, and the Act was declared to be void.

The property which is held by the corporation does not belong to the indi-
viduals, and as a consequence, the donations made to the corporation were never
intended to be given to the ten free persons of color, who alone compose its mem-
bers.

I have no doubt that the Article of the State Constitution, which says, vested
rights shall not be divested unless for purposes of public utility, and for an ade-
quate compensation previously made, will protect free people of color, and corpo-
rations formed by them, in the possession of property or rights appreciable in
money. Art. 105 Const. Therefore, the Act of 1850 did not prejudice the plain-
tiffs' rights.

The city ordinance alone remains to be examined. It is incompatible with the
plaintiffs' act of incorporation, and is an attempt to regulate the spiritual and
temporal affairs of a religious corporation composed of free persons of color. It
requires them to place, as a body, their affairs, spiritual and temporal, under the
control of some white congregation, and their preachers are to be licensed by
the Mayor. I find no warrant for this exercise, on the part of the City Council,
of power, in any act of incorporation of this city, or in any amendatory act
thereto.

The city authorities are authorized to regulate the police of *slaves*, and the po-
lice of *theatres, public balls, taverns, places for shows and exhibitions, houses of
public entertainment* and shops for *retailing liquors*, and to order the same to be
closed, whenever the preservation of order, and the public safety and tranquility
require it, and to impose such duties and regulations upon persons keeping the
same, as they may deem necessary and proper. See Phillips' Dig. 370. Beyond
this, I cannot find that the City Council has any authority to interfere with free
persons of color, if they conduct themselves peaceably and respectfully.

The necessity of some regulation of the kind contemplated by the ordinance
may exist, but the power to apply the remedy remains with the Legislature. It
has not yet, as I think, been conferred on the city. The city ordinance was,
therefore, void. Acts 1856, p. 141; Acts 1852, p. 48, sec. 22; 12 An. 433; Bul-
lard & Curry, 101, 128.

As the Act of 1850 cannot have any retroactive effect, and as the city ordi-
nance was void, the plaintiffs were under no restraint, and closed their churches
voluntarily, and hence have no right to recover damages. A body exercising
legislative functions could hardly be considered responsible in damages for merely
passing acts which prove to be illegal or unconstitutional.

In the preceding remarks I have refrained from expressing any opinion upon
the question, whether the plaintiffs may or may not have forfeited their fran-
chises. That question, in my opinion, can only be considered in a direct action
commenced in the name of the State, to have such forfeiture declared.

LAND, J., absent.